UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| MS TABEA SCHIFFAHRTSGESELLSCHAFT MBH & CO. KG | * * * | CIVIL ACTION |
| VERSUS | * * | NO. 08-3909 |
| BOARD OF COMMISSIONERS OF THE PORT OF NEW ORLEANS | * * | SECTION "L" (5) |

## Order and Reasons

Before the Court is the United States' motion to dismiss for lack of subject matter jurisdiction (Rec. Doc. No. 21). The Court has reviewed the extensive memoranda submitted by all parties involved, as well as the applicable law, and is now ready to rule.

*I. Background*

This case arises out of damage sustained to the MSC TURCHIA when it grounded and allided with the Napoleon Avenue Wharf, in the Port of New Orleans on June 2, 2008. The Plaintiff ship owner ("Tabea") sued the Board of Commissioners of the Port of New Orleans ("The Dock Board") for negligently failing to maintain the proper depth of water upon MSC TURCHIA's approach to and at the pier.

The Dock Board subsequently counter claimed, arguing Tabea's negligent docking caused damage to the Napoleon and Nashville Wharfs. The Board additionally joined the United States as a Third Party Defendant, arguing that the United States Army Corps of Engineers had a duty to properly dredge and maintain the navigable waterways of the Mississippi River and failed to do so. Further, Tabea filed a cross-claim against the United States echoing the Dock Board's negligence claim and adding a claim that the United States was contractually obligated

1

to dredge.

*II. Motion to Dismiss*

The United States moves for dismissal of all claims filed against it under Federal Rule of Procedure 12(b)(1), contending that this Court lacks subject matter jurisdiction over such claims. The Government argues that it has no statutory mandate to dredge any navigable waterway at a certain location or within a certain period of time. Decisions as to where and when to dredge, the Government contends, are discretionary decisions and thus are not subject to a waiver of sovereign immunity.

The Dock Board opposes the motion. The Dock Board interprets 33 U.S.C. §2232 to eliminate the Government's discretion regarding dredging, where, as here, a non-federal interest (the Dock Board) received a permit to dredge to -45'. The Dock Board contends that once they received this permit from the Army Corps of Engineers (the Corps) and paid for such dredging, the Federal Government became obligated to maintain dredging at that depth.

The Government responds that §2232 permits, but does not require, that the Government assume maintenance responsibilities over a non-federal dredging project. The Government relies on the fact that §2232 requires a determination by the Government that the project is economically justified, thus making the decision to dredge discretionary.

The Dock Board refutes this argument, claiming that the Government already determined that the project was economically justified when they issued a dredging permit to the Dock Board. The Government maintains that the economic justification requirement of issuing a permit is distinct from the one used in determining if the Government will commit its own funds to maintaining a non-federal interest's project.

2

Tabea also opposes the Government's motion. While Tabea's first opposition memoranda stated that the motion was premature while discovery was ongoing, Tabea filed a subsequent opposition memoranda alleging the Corps should not be dismissed from the instant case because they are liable as a result of their failure to warn of the shoal that the TURCHIA struck.

The Government responded to this allegation in further subsequent memoranda, arguing not only that the claim was never plead, but also, that the claim fails substantively, as it falls within the same discretionary exception discussed above.

## III. Law and Analysis

### a. Standard of Review

The standard of review for motions to dismiss under Federal Rule of Civil Procedure 12(b)(1) is the same as the standard for reviewing dismissals for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *See Benton v. United States*, 960 F.2d 19, 21 (5th Cir.1992). The moving party bears the burden of showing that "plaintiff can prove no set of facts consistent with the allegations in the complaint which would entitle it to relief." *Baton Rouge Bldg. & Constr. Trades Council AFL-CIO v. Jacobs Constructors, Inc.*, 804 F.2d 879, 881 (5th Cir.1986). The reviewing court "must accept all well-pleaded factual allegations in the light most favorable to the non-moving party." *American Waste & Pollution Control Co. v. Browning Ferris Inc.*, 949 F.2d 1384, 1386 (5th Cir.1991). Conclusory allegations or legal conclusions however will not suffice to defeat a motion to dismiss. *See Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir.1993). A court's ultimate conclusion that a case should be dismissed may rest "on any one of three separate bases: (1) the complaint alone; (2)

the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Barrera-Montenegro v. U.S.*, 74 F.3d 657, 659 (5th Cir.1996) (citations omitted).

### b. Sovereign Immunity and the Discretionary Function Exception

Generally, the United States is immune from suit unless it waives sovereign immunity. *See United States v. Sherwood,* 312 U.S. 584, 586 (1941). The Suits in Admiralty Act (SAA) provides the appropriate waiver for maritime tort claims against the Government. 46 U.S.C. § 30903 (2009). However, the Federal Tort Claims Act (FTCA) lists various exceptions to waiver of sovereign immunity. *See* 28 U.S.C. §2680 (2006). In particular, the FTCA provides an exception to waiver for claims arising out of the discretionary functions of a government agency or employee.

> Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute of regulation be valid, or based upon the exercise or performance *or the failure to exercise or perform* a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. §2680(a) (emphasis added). Though the discretionary function exception is not referenced within the SAA, the Fifth Circuit has found that the exception applies to SAA cases. *Baldassaro v. United States*, 64 F.3d 206, 208 (5th Cir. 1995). Here, the relevant inquiry is whether the Corps' failure to dredge and failure to warn of shoaling was protected by the discretionary function exception.

The purpose of the discretionary function exception is to eliminate the possibility of suit for any act that involves "an element of judgment or choice" on the part of a government agency

4

or employee. *United States v. Gaubert*, 499 U.S. 315, 322 (1991) *quoting Berkovitz v. United States*, 486 U.S. 531, 536 (1988). It "prevent[s] judicial 'second guessing' of legislative and judicial decisions grounded in social, economic, and political policy through the medium of an action in tort." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814 (1984).

The applicability of the discretionary function exception is governed by a two-part inquiry. First, the Court determines whether the challenged conduct involved "an element of judgment or choice." *Varig Airlines*, 467 U.S. at 813. Second, the Court determines whether the judgment at issue is the kind the discretionary function exception was designed to shield, that is, whether it is grounded in social, economic or political public policy. *See id.* "When a governmental policy such as a statute, guideline, or regulation allows an agent to exercise discretion, courts may presume that the agent's acts are grounded in policy in the exercise of that discretion." *Dunaway v. United* States, 136 F.Supp.2d 576, 579 (1999); s*ee also Gaubert,* 499 U.S. at 324.

### i. Failure to Dredge

The Corps develops and maintains the nation's navigable waterways, including the Mississippi River. Such maintenance is governed by 33 U.S.C. §540, which states,

> Federal investigations and improvements of rivers, harbors, and other waterways shall be under the jurisdiction of and shall be prosecuted by the Department of the Army under the direction of the Secretary of the Army and the supervision of the Chief of engineers, except as otherwise specifically provided by Act of Congress, which said investigations and improvements shall include a due regard for wildlife conservation.

Further,

5

> The Secretary of the Army, acting through the Chief of Engineers...in carrying out projects for improvement of rivers and harbors (other than surveys, estimates, and gagings) shall, by contract or otherwise, carry out such work in the manner most economical and advantageous to the United States.

33 U.S.C. §622(a).

The Corps practices and procedures regarding dredging are set forth in its Engineering Regulations.

> Dredging of any and all navigation projects shall be justified to reflect the current level of navigation activity at the project, to provide rationale for the channel dimensions to be dredged, the frequency of dredging, and at a minimum, the justification shall be in accordance with current budgetary guidance.
>
> Authorized navigation projects will be maintained to full constructed channel dimensions when feasible and justified.

See Rec. Doc. No. 21, ex. H. The Corps argues that the decision not to dredge the Mississippi River falls within the discretionary function exception. The Corps enjoys wide latitude, it asserts, in deciding where and when to dredge. The Dock Board argues that the use of the word "shall" in 33 U.S.C. §540 leaves the government no discretion with regard to dredging.

This issue has clearly been decided by the Fifth Circuit in *Canadian Pacific Ltd. v. United States*, 534 F.2d 1165 (5th Cir. 1976). The United States has not waived sovereign immunity for claims challenging the frequency of dredging. *Id.*. Specifically, the Circuit Court found that there was

> [N]o duty imposed on the Corps...to survey or dredge...at any particular time or place. To require such a duty would in effect make the Government the guarantor or insurer of the navigability at all times of the river, despite its ever-changing bed affected by tide, currents, erosion and wave wash of vessels constantly plying its course, and the limitation of

6

funds available to the Corps.

*Id.* at 1170. While the Dock Board is correct in pointing out that the Federal Government, and specifically the Corps, is charged with maintaining and improving this nation's waterways, "this grant of power certainly is not an assumption of the duty to make all interstate waterways navigable." *Id.* at 1171.

The Dock Board further contends that the Water Resources Development Act of 1986 (the WRDA), which was not at issue in *Canadian Pacific*, imposes a duty on the Government to maintain a depth of -45' in the location where the grounding occurred. It is undisputed that the WRDA authorizes the Dock Board, upon obtaining a permit from the Corps, to make improvements to their harbor. 33 U.S.C. §2232(a). The Dock Board however, argues that under §2232(f), the Corps must maintain any projects under §2232(a) the Dock Board undertakes. The Government replies that, when read in its entirely, §2232(f) allows the Corps discretion in determining whether to maintain the Dock Board's undertakings. §2232(f) states:

> Whenever a non-Federal interest constructs improvements to any harbor or inland harbor, the Secretary shall be responsible for maintenance in accordance with section 2211(b) of this title if--
>
> (1) the Secretary determines, before construction, that the improvements, or separable elements thereof, are economically justified, environmentally acceptable, and consistent with the purposes of this subchapter;
>
> (2) the Secretary certifies that the project is constructed in accordance with applicable permits and the appropriate engineering and design standards; and
>
> (3) the Secretary does not find that the project, or separable element thereof, is no longer economically justified or environmentally acceptable.

Read in its entirety, it is clear that the Secretary [of the Army] has discretion to determine whether or not to maintain a non-federal project. The Dock Board relies on the fact that the statute states the "Secretary shall be responsible for maintenance," in arguing that the Government has no discretion in its maintenance decision. However, clearly §2232(f)(1) gives the Secretary discretion to determine the feasibility of maintaining non-federal projects. The use of the word "shall" simply indicates that the Secretary of the Army must make a decision, but it does not indicate what decision he or she must make.

The Dock Board suggests that the Corps already made a decision that the project was economically and environmentally justified when it issued a permit to the Dock Board to undertake the dredging. They point to Corps policy on the issuance of permits for harbor improvements, in which the Corps states that economic and environmental factors, amongst many other various factors listed, will be considered in the issuance of a permit. *See* 33 C.F.R. §320.4(a)(1). However, in awarding a permit, economic considerations are not of the same brand as the economic considerations mentioned in §2232(f). Clearly, the Federal Government undertakes a different analysis when determining when to grant a permit for a non-federal entity to spend non-federal monies undertaking a project as opposed to when the federal government is determining when to commit their own federal funds to a project. The issuance of a permit to the Dock Board did not guarantee federal funds would also be dedicated to the project. Thus the Dock Board may not boot strap the economic analysis undertaken in the permitting of their own project to the analysis required under §2232(f) to commit

federal funds. To hold otherwise would set a precedent forcing the Government to finance the maintenance of every project they give out a permit for under §320.4(a)(1).

Furthermore, §2232(f)(3) gives the Secretary a continuing option to evaluate whether a project is any "longer economically justified or environmentally acceptable." Hence, even if the same economic analysis was done for awarding permits and delineating federal funds, the Corps has the power to determine after permitting that a project is no longer economically justified, and thus not worthy of federal funds for maintenance.

Considering that the Corps decision with regards to dredging under the WRDA requires (1) "an element of judgment or choice" and (2) that such judgment is "grounded in social, economic [and] political public policy," the decision falls within the discretionary function exception. *See Varig Airlines*, 467 U.S. at 813. Therefore, the Government has not waived sovereign immunity under §2232(f). All claims for failure to dredge are hereby dismissed.

### ii. Failure to Warn

On January 11, 2010, Tabea submitted a supplemental memorandum opposing the motion to dismiss arguing that the Corps is liable for failure to warn of shoaling when they had prior knowledge of the hazard. See Rec. Doc. No. 60.[1] Tabea argues that this failure to warn is not subject to the discretionary function exception. Tabea

---

[1]As a preliminary matter, the Government argues that Tabea did not originally claim failure to warn, and may not do so now without a showing of good cause under Federal Rule of Civil Procedure 16(b). Construing Tabea's cross claim liberally, the Court finds that Tabea's claim that the Corps is liable for their "negligence and failure to met [sic] its contractual and statutory duties" encompasses a failure to warn claim. Rec. Doc. No. 14, p. 3.

specifically points to the fact that while the Corps had knowledge of shoaling from hydrographic surveys they conducted, they sent no warning messages via email or their website to alert mariners in the area. Further, Tabea suggests that the fact that the Corps posted on their public website that New Orleans Harbor was in "Good Condition" was misleading and hazardous to mariners.

The Government does not argue that it has no duty to warn of hazardous navigable conditions. Rather, the Government responds that *how* it warns of shoaling falls within the discretionary function exception. Further, the Government argues that it properly discharged any duty it had to warn of shoaling in the vicinity where the TURCHIA was grounded.

It is undisputed that the Corps conducted hydrographic surveys on a survey line which runs approximately 150 feet from, and parallel to, the Napoleon and Nashville Avenue Wharfs. Further, it is clear that surveys taken throughout the months of April and May 2008 indicated that shoals existed near the Port of New Orleans. The surveys, which were taken at two to three week intervals, show the build up and break down of various shoals, leaving the vicinity 150 feet from the wharf in a constant state of change. These surveys were published on the Corps' public website, however no special warnings were added to the website to indicate the shoaling nor were email alerts sent out to those likely to be navigating the area. The Corps' website indicated that the Port was in "Good Condition."

While Tabea is likely correct that the Corps has no discretion on whether to warn of potential hazards of navigation, the Corps does have discretion in deciding how

it will warn of potential shoals. The Fifth Circuit has found that how the Corps warns of a navigation hazard falls within the discretionary function exception. *See Theriot v. United States*, 245 F. 3d 388 (5th Cir. 1998) (finding a Corps decision not to place a warning sign near a hazardous sill, but instead to rely on charting the sill and notifying the public through a Notice was within the discretionary exception); *Johnson v. United States,* 2000 WL 1528078, *3 (E.D. La., Oct. 13, 2000) ("The fact that the Government chose to warn mariners of dredging and obstructions through charts rather than markers is also clearly a discretionary function."); *Dunaway v. United States*, 136 F. Supp. 2d 576 (E.D. La. 1999) ("Any failure by the Corps or its employee to report, warn of, mark, or remove the sandbar is thus susceptible to policy analysis and satisfied the second prong of the discretionary function inquiry.") Here, the Corps timely posted on a public website the surveys done near the Port of New Orleans. Had the Corps withheld this information from the public this would be a different case. *See Indian Towing v. United States*, 350 U.S. 61 (1955) (holding the Coast Guard liable under the Federal Tort Claims Act for undertaking lighthouse service, having knowledge that the light was out, and failing to warn or notify those who would potentially be relying on it).

However, Tabea raises a valid argument that the Corps' website's posting that the waters near the Port were in "Good Condition" may have been inaccurate. At best, the statement is misleading. When the Corps accepts and undertakes the duty of providing information on navigable waterways, but then provides incorrect information on which others rely and are harmed, it may be held liable. *See Bean Horizon Corp. v.*

*Tenn. Gas Pipeline Co.*, 1998 WL 113935 (E.D. La., Mar. 10, 1998) (holding the Corps liable where a dredging operation hit a pipeline because they were relying on an improperly marked chart released by the Corps). It is unclear at this phase in the litigation whether the "Good Condition" posting was negligent or not. The Government raises a strong argument that "whether a shoal constitutes a hazard depends on whether a vessel intends to sail over it and, if so, how much water that vessel requires." See Rec. Doc. No. 66, p.7. Further, the Port of New Orleans is an everchanging landscape. It is clear even from the surveys presented by the Corps that shoals build up and break down at fast rates, and that the presence of shoals is not uncommon. Tabea has a steep hurdle to overcome in proving that the Corps "Good Condition" posting was misleading or itself hazardous. However, at this stage, the Government does bear the burden of proof, and considering all facts in the light most favorable to Tabea, the Government has not shown that Tabea "can prove no set of facts consistent with the allegations in the complaint which would entitle it to relief." *Baton Rouge Bldg. & Constr. Trades Council AFL-CIO v. Jacobs Constructors, Inc.*, 804 F.2d 879, 881 (5th Cir.1986).

    **c. Contract Claim**

Tabea raises a contract claim in their supplemental brief based on the deposition testimony of Michelle Ulm, an employee of Corps. Ulm testified:

Q. So 100 feet off the wharf is...the corps of Engineers' responsibility?

A. Yes.

Q. But not from 100 feet towards the wharf, that's the Dock Board's

responsibility?

A. The Port of New Orleans.

See Rec. Doc. No. 60, ex.1, p.99, lines 2-10. Tabea suggests that this testimony amounts to a contractual agreement between the Corps and the Dock Board and that Tabea, a third party, relied on the contract. Tabea provides no other evidence of a contract between the Government and the Dock Board and cites no authority indicating that this testimony would amount to anything close to a contract. Further, even if a contract did exist, there has been no waiver of sovereign immunity. *See Winter v. Floorpro, Inc.*, 570 F.3d 1367, 1370-71 (Fed. Cir. 2009) (finding waiver of sovereign immunity with regards to contract claims applies "only to 'contractors,' i.e., 'part[ies] to a Government contract other than the Government.'"). The contract claims asserted against the Government are hereby dismissed.

### d. Violations of the Rivers and Harbors Act

The Government moves to dismiss claims asserted under the Rivers and Harbors Act, 33 U.S.C. § 403. Neither the Dock Board nor Tabea oppose dismissal of these claims in their opposition memoranda. Further, it appearing that this part of the Government's motion is grounded in law and fact, the claims based on violations of the Rivers and Harbors Act are hereby dismissed with prejudice.

## *IV. Conclusion*

IT IS ORDERED that the Government's Motion to Dismiss is hereby GRANTED IN PART and DENIED IN PART. All Failure to Dredge Claims, Contract Claims, and Rivers and Harbors Act claims against the Government are hereby

DISMISSED WITH PREJUDICE. Any claims raised by Tabea or the Dock Board with regards to Failure to Warn of Shoaling remain intact.

New Orleans, Louisiana, this 19th day of February, 2010.

_____
District Court Judge