UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| MS TABEA SCHIFFAHRTSGESELLSCHAFT | * | CIVIL ACTION |
| MBH & CO. KG | * | |
| | * | |
| VERSUS | * | NO. 08-3909 |
| | * | |
| BOARD OF COMMISSIONERS OF | * | SECTION "L" (5) |
| THE PORT OF NEW ORLEANS | * | |

FINDINGS OF FACT & CONCLUSIONS OF LAW

I. BACKGROUND AND PROCEDURAL HISTORY

This case arises out of damages sustained when the MSC Turchia, a container ship, grounded in the Port of New Orleans on June 2, 2008, causing its bow to swing starboard and allide with the Napoleon Avenue Wharf. MS Tabea Schiffahrstgesellschaft mbH & Co. KG ("Tabea"), the owner of the Turchia, initially filed this case against the Board of Commissioners of the Port of New Orleans ("Dock Board"), alleging that the Dock Board negligently failed to maintain the proper depth of water at and around the wharf. The Dock Board counterclaimed against Tabea, alleging that Tabea was negligent in docking Turchia and thereby caused damages to the wharf.

The Dock Board also joined the United States as a third-party defendant based on several claims of liability, and Tabea filed a cross-claim against the United States echoing those claims. In February 2010, the Court partially granted a motion to dismiss filed by the United States. As a result, the last remaining claim against the United States concerned an alleged failure to warn. More specifically, it was alleged that the United States Army Corps of Engineers ("the Corps") was negligent in failing to warn of navigation hazards prior to the grounding of the Turchia.

Tabea and the Dock Board subsequently entered into a settlement agreement, under

1

which Tabea's claim against the Dock Board and the Dock Board's counterclaim against Tabea were dismissed. In addition, Tabea withdrew its cross-claim against the United States. In consequence, the remaining claim that proceeded to trial in this case was the Dock Board's claim against the United States for its alleged failure to warn. Prior to trial, the two parties stipulated to the amount of damages the Dock Board sustained. The only issue that was tried was that of liability.

The Court has carefully considered the testimony of all of the witnesses, the exhibits entered into evidence during the trial, as well as the record. Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court hereby enters the following findings of fact and conclusions of law. To the extent that any findings of fact may be construed as conclusions of law, the Court hereby adopts them as such. To the extent that any conclusions of law constitute findings of fact, the Court adopts them as such.

## II. FINDINGS OF FACT

1. The Dock Board is the owner of the Napoleon Avenue and the Nashville Avenue Wharves located at approximately Mile 99 Above Head of Passes (AHP) on the Mississippi River in the Port of New Orleans.

2. In 2000, the Dock Board obtained a permit to dredge to minus-45 feet National Geodetic Vertical Datum (NGVD) from the face of the wharf to the river's natural 45-foot contour. In 2002, the Dock Board's application to amend its dredging permit to enable it to dredge to, and maintain a depth of, minus-47 feet NGVD from the face of the wharf to the river's natural 47-foot contour was approved. This permit is to expire in 2012.

3. In 2005, the Dock Board acquired sounding equipment that allows it to make what is

alternatively known as a full-bottom, area, cross-section, or grid survey of the waters off

the face of the Napoleon Avenue Wharf. When the Dock Board uses this equipment, it

has the capacity to survey the area from the face of the wharf up to about 1,000 feet into

the river. This area includes the "approach" – the area through which vessels travel in

order to move from the main channel of the river to the berth.

4.     Using the raw data collected from the sounding, the Dock Board can produce a contour

map. The map shows an aerial view of the waters and the different levels of water depth.

The Dock Board section numbers are also indicated on the map, thereby indicating the

water depth around the different berths at the wharf.

5.     The Dock Board performed a full-bottom survey on March 4, 2008 and on June 6, 2008.

Mr. Ronald Partridge, an employee of the Dock Board who performs these surveys,

cannot remember if he did a survey before March 4, 2008. He is certain that he did not

perform a full-bottom survey between March 4, 2008 and June 6, 2008.

6.     In addition to the full-bottom surveys done up to 1,000 feet off the face of the wharf, the

Dock Board on a weekly basis performs what is alternatively known as a profile or a line

survey about 20 feet off the face of the wharf. Such a survey shows the depth of the

water, but only along a line 20 feet off the face of the wharf.

7.     Depending on funding, the height of the river, and other conditions, the Corps dredges

once or twice a year in the vicinity of the Napoleon Avenue Wharf. The Corps dredges to

minus 35 feet Mean Low Gulf (MLG) plus an additional 3 feet of advanced maintenance.

The dredge starts about 100 feet from the face of the wharf and continues to the naturally

occurring deepwater navigation channel. The figure of 35 feet MLG is known as the

project depth. The actual water depth obtained after dredging can be calculated by adding the project depth with the applicable river gauge reading.

8.  The Corps performs line surveys in the New Orleans Harbor. To conduct such a survey, the Corps deploys a survey vessel that collects data along a single line in the Mississippi River about 150 feet off the face of the wharf. Depending on the time of year and river conditions, such surveys are performed one to six times per month. The Corps performed such surveys on April 23, 2008; April 29, 2008; May 12, 2008; and May 29, 2008.

9.  Because the data is collected along a single line, the Corps cannot know with complete certainty the depth of water beyond that line. A full-bottom survey, like that of the Dock Board, provides such conclusive information. The Corps, however, considers the line survey to provide a satisfactory basis upon which to determine whether dredging is required – and thus the extent to which the waters are navigable – in the area beyond the survey line.

10. Using the raw data obtained by the survey vessel, the Corps plots out the survey. The survey contains two items: 1) a profile view of the river that indicates the water depths along the line surveyed by the Corps, and 2) an aerial view of the river and of the line along which survey data was collected. The aerial view of the river does not include the Dock Board's section numbers. The plotted-out survey for May 29, 2008 contains the survey data for the three preceding surveys. The survey was processed and plotted out on May 30, 2008.

11. Every time the Corps plots out a survey, it publishes a copy of the survey on its public website. After the initial posting, the Corps double-checks the website to ensure that the

new survey is in fact available. To access the webpage, a user clicks on the button "Services" on the homepage of the Corps's New Orleans Team website. On the drop-down menu that is provided, the user then clicks the button "Navigation."

12.     The next webpage states that the Corps is "[r]esponsible for facilitating safe, reliable, and economically efficient movement of vessels." On that page, there is a link called "Channel Surveys." Clicking the link leads the user to another webpage. That page states that the Corps surveys are "very useful to supplement published navigational charts with more recent shoaling . . . data." The page provides a list of the Corp's survey areas and includes a link called "New Orleans Harbor." Clicking the link leads the user to a webpage that lists the latest surveys for the different areas in the New Orleans Harbor that the Corps surveys.

13.     The survey that is available on the website comes directly from the Microstation software that the Corps uses to process and plot out the survey data, and the survey is viewed using the Bentley Publisher Viewer software on the webpage. The Corps purchased the license for the viewing software so that it could be available for free to the general public.

14.     The viewing software provides a user with buttons with which to zoom in and out and otherwise manipulate the survey. At trial, Ms. Bachvan "Cindy" Doan, the Corps employee who processes and plots out the survey, had difficulty reading hardcopy of the survey posted on the Corps' public website and two zoomed-in views of the survey. Mr. Partridge also had difficulty reading those materials. Mr. Lenny Spallutto, a Dock Board employee, testified that he found it difficult to use the Corps website but that he has "a

difficult time with most . . . programs."

15.   The viewing software provides a link "How do I use this viewer?" for users unfamiliar
with the software. Ms. Michelle Ulm, the Corps's operations manager, testifies that she
had no difficulty using the software to obtain an easy-to-read view of the survey. Such a
view enables one to see the survey data, including the water depths collected.

16.   When the Corps launched its online publication of the survey in 2000, it held a meeting
to provide a demonstration of the website to individuals the Corps considered
stakeholders, including Dock Board personnel. The Corps does not otherwise offer
tutorials or training sessions. Ms. Ulm testifies that she does receive phone calls asking
questions on how to use the viewing software. Ms. Ulm's contact information is provided
on the webpage that lists the surveys done in the New Orleans Harbor.

17.   The Corps mails out hard copies of the survey to the Dock Board and the Crescent City
River Port Pilots Association ("Pilots Association") via regular United States postal mail.
Since September 2007, Mr. Jimmy Hankins has been the Dock Board's Marine Terminal
Superintendent. In that capacity, he assigns berths to all incoming vessels. Although Mr.
Hankins testified that he receives the Corps survey only once every few months, the
credible evidence is that the Corps mails out the hard copies every time it produces a
survey. Ms. Ulm and Ms. Doan both testified that the surveys are mailed out in hard
copies every time a survey is completed.

18.   When the Corps first decided to publish its surveys on its public website in the late
1990s, it sent out a notice indicating that in accordance with the Army's paperwork
reduction mandate, it was planning to stop providing hard copies of the survey. In

response, the Dock Board and the Pilots Association specifically requested the Corps to
continue to mail hard copies to them. Ms. Ulm testified that she has received no
complaints from the Dock Board about not receiving the surveys by mail.

19.     The Corps organizes and hosts a monthly Mississippi River Maintenance Forum meeting.
The purpose of the meeting is to discuss river conditions and any item of interest. The
Corps brings its line surveys and the preceding week's Mississippi River Conditions
Update to the meeting. The surveys are available for reference and review by all
attendees. During the meeting, Ms. Ulm, who runs the meetings, reviews the Conditions
Update line by line and tells the attendees to refer to the Corps surveys. Ms. Ulm also
discusses the status of current or planned dredging. Ms. Ulm asks the attendees if they
have any questions or concerns. She also discusses any new projects that the Corps
undertakes, such as the addition of new products to the Corps website.

20.     The Corps invites by email about 200 individuals, whom the Corps calls stakeholders, to
these regular meetings. In 2008, Mr. Hankins and several other Dock Board employees
were listed as members of the Mississippi River Maintenance Forum and were thus
invited to attend the meetings. Two representatives of the Pilots Association were also
listed as members of the forum. The attendance records for the meetings held on January
9, 2008, February 13, 2008, March 5, 2008, April 2, 2008, and May 14, 2008 indicate
that no individual on behalf of the Dock Board attended the meetings.

21.     When the Corps opens a bid for a dredging contract or awards such a contract, Ms. Ulm
makes a phone call to the Dock Board. She speaks with either Mr. Hankins or Mr. Chris
Wyckoff – the Dock Board's dredge manager – depending on who answers the phone. In

such a conversation, Ms. Ulm asks the Dock Board employee to pull out the hard copy of

the recent Corps survey. Going through the profile view of the river as depicted on the

Corps survey, Ms. Ulm informs the Dock Board of the areas that the Corps plans to

dredge and asks if the Dock Board has different priorities. If the Dock Board indicates

that it does not use a particular area, the Corps does not dredge that area in order to save

funds, which can then be used for other areas. The Corps and the Dock Board then

discuss parking and other logistical issues. The conversation lasts about five minutes. The

Corps does not have a custom or practice of calling the Dock Board to specify that a

Corps survey reveals shoals along the line 150 feet off the face of the wharf.

22.     On May 7, 2008, the Corps awarded a dredging contract for the New Orleans Harbor; the

project was to span six miles. Sometime thereafter, Ms. Ulm called the Dock Board to

have the aforementioned conversation. On May 8, 2008, the Corps issued a Navigation

Bulletin indicating that pursuant to the contract, the dredge was to begin working on May

13, 2008 and that the work would continue for about 60 days.

23.     The Corps held a Preconstruction Conference on May 12, 2008. The purpose of the

meeting was to discuss the specifics of the dredging contract awarded on May 7, 2008,

including where the dredging was going to take place. Mr. Wyckoff and Mr. Hankins

were invited by email to attend the conference. The attendance record indicates that Mr.

Wyckoff attended the meeting, but that Mr. Hankins did not.

24.     The Corps issues a document entitled the Mississippi River Conditions Update on a

weekly basis. This document is distributed to the recipients of the Corps's line surveys.

The Conditions Update for May 30, 2008 states that "New Orleans Harbor is in good

8

condition." Mr. Hankins testified that he takes that phrase to mean that "there's sufficient water throughout the harbor." Immediately below the statement that the "New Orleans Harbor is in good condition," the May 30, 2008 Conditions Update indicates that the *George D. Williams* dredge is dredging around the Poydras Street Wharf and would be moving to the area around the Orange Street Wharf the following week.

25.     On May 28, 2008, a berth application was filed on behalf of the Turchia with the Dock Board. The application specifies that the container ship requires 45 feet of water at berth. Mr. Hankins assigned the Turchia to the Nashville Avenue Wharf Section C. The credible evidence is that before he did so, Mr. Hankins referred only to the 20-foot profile survey to determine whether the Port could offer the water depth requested by a vessel. He so stated at his deposition and at trial. His additional testimony at trial, prompted by a question, that he also looks at the sounding surveys of the Corps as a "standard operating procedure" is undercut by his testimony that he receives the survey only "every couple of months." The credible evidence thus is that Mr. Hankins did not consult the most recent Corps survey when he made the berth assignment for the Turchia. A document entitled "Assignment of Berth" indicates that the Turchia was to arrive at 19:30:00 hours on June 2, 2008.

26.     Captain Brian Boyce is an expert in computer-based interactive reconstructions of collisions, groundings, and allisions. Using data collected from the Turchia's voyage data recorder, a device akin to an airplane's black box, as well as sounding numbers from the National Oceanic and Atmospheric Administration, Captain Boyce prepared a computer reconstruction of the June 2, 2008 grounding and allision of the Turchia.

27. The reconstruction indicates that at 17:44:00 hours on June 2, 2008, the Turchia was near the Napoleon Avenue and Nashville Avenue Wharves and moving at 2.2 knots. Three seconds later, the water speed stopped, indicating that the ship had grounded. The Turchia's bow swung to the right, and its stern swung to the left. The starboard bow of the Turchia struck the Napoleon Avenue Wharf. The point at which the Turchia pivoted is where the ship met resistance and was the general area where the Turchia grounded.

28. The reconstruction indicates that the distance from the wharf to the pivot point was about 320 feet. The reconstruction also indicates that the distance from the wharf to the Corps survey line was about 180 feet. The grounding point was thus about 140 feet farther into the river than the Corps survey line.

29. On June 3, 2008, Mr. Charley Marcussen, who was retained by Tabea's counsel, went to the area of the incident to coordinate a sounding survey. The survey began at a point suggested by Captain Wlodzimierz Andrzej Kowalski of the Turchia. It found that the four shallowest spots of water in the area were 200 feet, 210 feet, 275 feet, and 300 feet from the face of the wharf, respectively. Mr. Marcussen testified that these were not necessarily where the Turchia grounded.

30. A day after the grounding and allision of the Turchia, the Dock Board contacted the Corps, requesting the Corps to perform a full-bottom survey of the area at issue. The Corps conducted the survey and gave the data to the Dock Board the same day.

31. Since the incident, the Dock Board runs on a weekly basis a full-bottom survey from the face of the wharf to 1,000 feet into the river. Mr. Partridge understands that he is to contact the Pilots Association and several employees of the Dock Board, including Mr.

10

Hankins, if the survey indicates that the area lacks the water depth that he understands the Dock Board to need.

32.    Mr. Hankins testified that the full-bottom survey provides more information than the Corps survey. Had he had a full-bottom survey, he would have taken a different action with respect to the Turchia's berth application.

## III. CONCLUSIONS OF LAW

### A. Sovereign immunity and subject-matter jurisdiction

1.    "The principle of sovereign immunity protects the federal government from suit." *Pena v. United States*, 157 F.3d 984, 986 (5th Cir. 1998). If it is not expressly waived, sovereign immunity works to "deprive[] federal courts of subject matter jurisdiction." *Bodin v. Vagshenian*, 462 F.3d 481 (5th Cir. 2006) (citing *Chapa v. U.S. Dep't of Justice*, 339 F.3d 388, 389 (5th Cir. 2003)).

2.    A court "must address jurisdictional questions whenever they are raised and must consider jurisdiction *sua sponte* if not raised by the parties." *Howery v. Allstate Ins. Co.*, 243 F.3d 912, 919 (5th Cir. 2001). "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3). "[A] federal court may not hypothesize subject-matter jurisdiction for the purpose of deciding the merits." *Ruhrgas AG v. Marathon Oil*, 526 U.S. 574, 577 (1999) (citing *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 93-94 (1998)); *accord Stanley v. Central Intelligence Agency*, 639 F.2d 1146, 1157 (5th Cir. 1981) ("When a court must dismiss a case for lack of jurisdiction, the court should not adjudicate the merits of the claim." (Internal citations omitted)).

11

3.      The Suits in Admiralty Act (SAA), 46 U.S.C. § 30903(a), "serves as a waiver of

sovereign immunity." *Theriot v. United States*, 245 F.3d 388, 396-397 (5th Cir. 1998). It

is thus a grant of subject-matter jurisdiction. *See Gordon v. Lykes Bros. S.S. Co., Inc.*,

835, F.2d 96, 98 (5th Cir. 1988) (noting that "the SAA is a jurisdictional statute [for]

admiralty suits against the United States"); *see also Martin v. Miller*, 65 F.3d 434, 438

(5th Cir. 1995) (noting that the SAA "'provides a jurisdictional hook upon which to hang

a traditional admiralty claim' against the United States" (quoting *Trautman v. Buck

Steber, Inc.*, 693 F.2d 440, 444 (5th Cir. 1982))).

4.      An exception to this waiver of immunity lies in the discretionary function exception set

forth in the Federal Tort Claims Act. *See* 28 U.S.C. § 2680(a). Although it is not

referenced in the SAA, the exception may render the Government immune to a suit

brought under the SAA. *Baldassaro v. United States*, 64 F.3d 206, 208 (5th Cir. 1995).

The discretionary function exception applies, however, only if the challenged conduct

meets the two-prong test laid out by the Supreme Court: The government's allegedly

wrongful act must have 1) involved "an element of judgment or choice" and 2) must have

been "grounded in social, economic, or political policy." *United States v. S.A. Empresa

de Viacao Aerea Rio Grandense*, 467 U.S. 797, 813-14 (1984) [*Varig Airlines*]. The Fifth

Circuit has cautioned that the discretionary function exception should not be "construed .

. . so that [it] swallows the rule." *Lively v. United States*, 870 F.2d 296, 299 (5th Cir.

1989). An important touchstone in the inquiry is whether the challenged conduct is of

"the type that Congress sought to protect." *Id.*

5.      While the initial decision of whether to warn a party of danger may in certain

circumstances be within the discretion of the Government, *see, e.g.,Theriot*, 245 F.3d at

396-97; *Tringali Bros. v. United States*, 630 F.2d 1089, 1090 (5th Cir. 1980), the

Government may not invariably avail itself of the discretionary function exception in a

case concerning an alleged failure to warn. *See, e.g.*, *Sheridan Transp. Co. v. United

States*, 897 F.2d 795, 797 (5th Cir. 1990); *see also Farber v. United States*, 56 F.3d 1122,

1126-28 (9th Cir. 1995); *Cope v. Scott*, 45 F.3d 445, 451-52 (D.C. Cir. 1995); *Andrulonis

v. United States*, 952 F.2d 652, 653, 655 (2d Cir. 1991); *Boyd v. United States*, 881 F.2d

895, 896 (10th Cir. 1989). This is because a failure to warn may implicate only

"considerations of safety, not public policy," *Farber*, 56 F.3d at 1125, and thus fail the

second prong of the discretionary-function inquiry. *See also In re Katrina Breaches

Consol. Litig.*, 647 F. Supp. 2d 644, 705 (E.D. La. 2009) ("While the Corps maintains

that all of its decisions were policy driven, when those decisions concern safety and

engineering judgments, [the discretionary function] is not an absolute shield.").

6.    Even if the decision of whether to warn a party of danger is discretionary, the

Government is subject to liability if it voluntary assumes, and negligently performs, that

task. *See, e.g.*, *Indian Towing Co. v. United States*, 350 U.S. 61, 69 (1955); *Theriot*, 245

F.3d at 396; *Coumou v. United States*, 114 F.3d 64, 65 & n.23 (5th Cir. 1997); *Sheridan

Transp. Co. v. United States*, 834 F.2d 467, 474 (5th Cir. 1987); *Wiggins v. United States*,

799 F.2d 962, 966 (5th Cir. 1986); *Wysinger v. United States*, 784 F.2d 1252, 1253 (5th

Cir. 1986); *Tringali Bros.*, 630 F.2d at 1090. "[T]he discretionary exception only reaches

the discretionary decision as to whether to provide the service." *Wiggins*, 799 F.2d at

966. "Once the Corps takes an action, it must act reasonably with respect to those who

are likely to rely upon it." *Bean Horizon Corp. v. Tenn. Gas Pipeline Co.*, 1998 WL 113935 at *7 (E.D. La. 1998).

7.     In this case, the Dock Board's failure-to-warn claim encompasses two separate contentions. First, the Dock Board asserts that the Mississippi River Conditions Update issued on May 30, 2008 was misleading because it stated that the "New Orleans Harbor is in good condition." Second, the Dock Board asserts that the Corps's May 29, 2008 survey gave the Corps knowledge of shoals in the area and that the Corps failed to relay that information to the Dock Board.

8.     With respect to the Dock Board's assertion that the Conditions Update was misleading, it is highly doubtful that this challenged conduct falls within the discretionary function exception. As the Fifth Circuit has indicated in a similar case, the provision of misleading information cannot be said to rest on public policy considerations. *See Sheridan Transp.*, 897 F.2d at 798 ("We are aware of no consideration of public policy which is involved in a decision to place a wreck buoy in a position where it does not indicate the location of the wreck it purportedly marks . . . ."). To hold that it is entirely within the discretion of the Corps to decide whether to provide misleading information to the public would be to impute to Congress the "inten[t] to shield from tort liability" the dissemination of such information even when it implicates the safety of others. *Varig Airlines*, 467 U.S. at 813. It is questionable whether Congress had such intent.

9.     More broadly, and more importantly, it is clear in this case that the Corps has voluntarily undertaken the task of disseminating information about shoals to entities that the Corps admits to be stakeholders with respect to the navigability – and hence, the safety – of the

14

New Orleans Harbor. Of course, it is well-settled that the Corps has no duty to "conduct sounding surveys of navigable waters at any particular time to assure navigators that shoaling is not occuring." *Canadian Pac. (Bermuda) Ltd. v. United States*, 534 F.2d 1165, 1168 (5th Cir. 1976). And the Government has attempted to cast the Corps's decision to undertake such soundings as one that corresponds only to its equally discretionary decision to dredge the New Orleans Harbor. *See id.* (concluding that the Corps has no duty to dredge navigable waters).

10.    The evidence belies the notion, however, that the Corps conducts its surveys only to determine whether it should dredge the harbor and that the Corps has otherwise nothing to do with the navigability and safety of the area. It is undisputed that the Corps provides services related to navigation – after all, the Corps's website lists "Navigation" as one of the options under the "Services" menu. On the webpage regarding navigation-related services, the Corps states that it is "[r]esponsible for facilitating [the] safe, reliable, and economically efficient movement of vessels." And the webpage enabling users to download its line surveys, the Corps states that these documents are "very useful" because they can be used "to supplement published navigational charts with more recent shoaling . . . data." The argument that the Corps is wholly divorced from the enterprise of ensuring navigability and safety in the New Orleans Harbor rings hollow.

11.    Beyond the Corps's own public statements about its role in helping to ensure the navigability and safety of the waters, the Corps's decision to distribute its surveys and the Mississippi River Conditions Update to others is also significant. As noted above, the Corps disseminates these materials to entities that the Corps consistently calls

stakeholders. These include the Dock Board and various river pilots associations, including the Crescent City River Pilots Association. Given that a wharfinger is charged with "the duty to . . . make [the berth] safe [and] warn the ship of any hazard or deficiency known to [him]," *Trade Banner Line, Inc. v. Carribean S.S. Co.*, 521 F.2d 229, 230 (5th Cir. 1975), and that a river pilot "'must be constantly informed of [objects] against which his vessel might be injured,'" *Transorient Navigators Co., S.A. v. M/S SOYTHWIND*, 714 F.2d 1358, 1367 (5th Cir. 1983) (quoting *Atlee v. Packet Co.*, 88 U.S. (21 Wall.) 389, 396 (1874)), the Corps's decision to disseminate the Conditions Update and its surveys to the Dock Board and Pilots Association clearly underscores its understanding that it is playing a role in helping to ensure the navigability and safety of the New Orleans Harbor. Under these circumstances, it is obvious that the Corps has gone beyond the realm in which it has the discretion to decide whether to provide information regarding navigability and safety in the New Orleans Harbor. It has made the decision to play a part in ensuring the navigability and safety of the harbor.

12.    This case thus fits comfortably with the Supreme Court's decision in *Indian Towing Co. v. United States*, 350 U.S. 61 (1955), and its progeny. It accords with the Fifth Circuit's recognition that once the Government does exercise its discretion to provide a service, it cannot shield itself from a suit alleging that it acted unreasonably with respect to those who rely on it. *See, e.g., Theriot*, 245 F.3d at 396; *Coumou*, 114 F.3d at 65 & n.23; *Sheridan Transp.*, 834 F.2d at 474; *Wiggins*, 799 F.2d at 966; *Wysinger*, 784 F.2d at 1253; *Tringali Bros.*, 630 F.2d at 1090.

13.    Thus, pursuant to Article III of the Constitution and the SAA, *see* 46 U.S.C. § 30903(a),

the Court has subject-matter jurisdiction over the Dock Board's failure-to-warn claim against the Government. Venue is appropriate because the Dock Board's principal place of business is in the Eastern District of Louisiana. *See* 46 U.S.C. § 30906(a)(1) ("A civil action [under the SAA] shall be brought in the district court of the United States for the district in which . . . any plaintiff resides or has its principal place of business.").

**B. The Merits of the Dock Board's Claim**

14.     Under the SAA, the Government owes the same standard of care as "that of a private person in like circumstances"– that is, the standard of "due care." *Canadian Pac.*, 534 F.2d at 1168; *accord S. Natural Gas Co. v. Pontchartrain Materials, Inc.*, 711 F.2d 1251, 1254 (5th Cir. 1983) (noting that this is a "settled" principle in the Circuit).

15.     Under this standard, the Government cannot be held liable for an alleged failure to warn if it had no prior knowledge of the hazard. *See Canadian Pac.*, 534 F.2d at 1169 (holding that no liability could be imposed because "the Government had no prior knowledge of the existence of the shoal which caused the accident and therefore could not and did not mislead"); *see also Transorient Navigators*, 714 F.2d at 1367.

16.     Nor can the Government be held liable if a reasonably prudent person would avail himself of the measures undertaken by the Government and thereby avoid injury. *See De Bardeleben Marine Corp. v. United States*, 451 F.2d 140, 149 (5th Cir. 1971); *Liner v. Dravo Basic Materials Co.*, 162 F. Supp. 2d 499, 505 (E.D. La. 2001).

17.     And the Government cannot be held liable if the plaintiff did not rely on the measures undertaken by the Government in sustaining an injury. "Evidence of reliance is necessary to establish that governmental negligence was a cause of injury." *Sheridan Transp.*, 834

F.2d at 474; *see also Indian Towing*, 350 U.S. at 69;  *Inter-Cities Navigation Corp. v. United States*, 608 F.2d 1079, 1082 (5th Cir. 1979); *Liner*, 162 F. Supp. 2d at 505.

18.     As previously noted, the Dock Board's failure-to-warn claim is based on two separate assertions. First, the Dock Board asserts that the Mississippi River Conditions Update issued on May 30, 2008 was misleading because it stated that the "New Orleans Harbor is in good condition." Second, with respect to the Corps's May 29, 2008 sounding survey, the Dock Board does not argue that it is misleading. Instead, it asserts that the survey gave the Corps knowledge of shoals in the area and that the Corps failed to relay that information to the Dock Board. In light of the credible evidence and the applicable law, neither of these arguments are availing.

19.     First, the weight of the evidence indicates that the Corps may not have had actual knowledge of the shoals on which the Turchia grounded. Indeed, the computer reconstruction of the incident puts the area of shoaling at about 140 feet away from the Corps's survey line. To be sure, given that the Corps finds that its line survey provides a sufficient basis upon which to determine whether it should dredge the area from about 100 feet off the face of the wharf to the naturally occurring deepwater navigation channel, the line survey may provide a basis upon which to impute to the Corps knowledge of shoals in the entire area. But this is a tenuous connection. To the extent, then, that the Corps's May 29, 2008 line survey did not give notice of the shoals to the Corps, the Government could not have misled the Dock Board via its Conditions Update. And the Government could not have failed to give notice of something that it did not know. This precludes the imposition of liability on the Government. *See Canadian Pac.*,

534 F.2d at 1169; *see also Transorient Navigators*, 714 F.2d at 1367.

20.   Second, even if one were to assume that the Corps surveys did reveal the shoals that

caused the grounding and allision or that the Corps should have known of the shoals, the

Government undertook adequate measures – and thus exercised due care – through the

various ways in which it disseminated the surveys. The Dock Board has suggested as a

threshold matter that the Corps survey may be useless because it does not contain the

Dock Board's section numbers. But given that Ms. Ulm speaks with Dock Board

personnel to determine whether dredging should be done based on the Corps survey,

there is no reason to believe that the Dock Board is unable to determine the locations of

the wharf sections on the Corps survey.

21.   The Corps exercised due care in the way it distributed the survey. The credible evidence

indicates that while the May 29, 2008 survey may not have reached the Dock Board by

mail in time, the preceding May 12, 2008 survey was at the disposal of the Dock Board in

hard copy. Moreover, the May 29, 2008 survey was easily available on the Corps's

public website. The Corps also provided a help feature on the website, and Ms. Ulm's

contact information was made available. Altogether, it is clear that a reasonably prudent

wharfinger would have availed himself of the different ways in which the surveys were

disseminated. Thus, even if one were to assume that the Corps's line survey did indicate

shoaling – as the Dock Board urges – it is clear that the Corps exercised due care in

disseminating the information in its possession and that a reasonably prudent wharfinger

would have averted the grounding and allision at issue.

22.   Furthermore, the credible evidence supports the conclusion that the Dock Board was not

reasonably prudent in determining water depth. It had at its disposal equipment to perform full-bottom surveys, but it did not use it to obtain an understanding of the water depths at and around the wharf. It had at its disposal the Corps's line surveys, but the only material that it consulted in assigning the Turchia to the Nashville Avenue Wharf was its 20-foot profile survey. The Dock Board had been invited to the monthly Mississippi River Maintenance Forum meetings, but no employee of the Dock Board attended any of the meetings in 2008. And Mr. Hankins, who is in charge of assigning berth space, was invited, but did not attend the Pre-Construction Conference held a few weeks before the incident. The purpose of that conference, as noted above, was to discuss the details of dredging work in the New Orleans Harbor.

23.   The Dock Board argues that attendance at these meetings is not relevant to the inquiry because the shoaling at issue most likely formed shortly before the incident. The failure of the Dock Board to participate at any of these meetings is nonetheless significant, however. When considered in tandem with the only action that the Dock Board took to ascertain the depths of water before making the berth assignment for the Turchia – referring to its 20-foot profile survey – it underscores the general lack of reasonable prudence on the part of the Dock Board in determining water depths around the wharves. Under these circumstances, it is clear that the Government exercised due care and cannot be held liable for the damages the Dock Board sustained. *See De Bardeleben Marine*, 451 F.2d at 149; *Liner*, 162 F. Supp. 2d at 505.

24.   Finally, the Dock Board has argued that Mississippi River Conditions Update issued on May 30, 2008 was misleading when it stated that "the New Orleans Harbor is in good

condition." This statement might indeed be misleading if it is viewed in isolation. It should be noted, however, that immediately below it, the Corps also indicated that dredging was ongoing in the New Orleans Harbor: the dredge was moving from the area around the Poydras Street Wharf to the Orange Street Wharf. The indication that dredging was occurring undercuts the notion that the statement can reasonably be interpreted, as Mr. Hankins testified, to mean that "there's sufficient water throughout the harbor."

25.     Equally, if not more important, there is no evidence that Mr. Hankins, who invited the Turchia into the Port, consulted the Conditions Update when he made the decision to do so. In fact, the credible evidence is that Mr. Hankins looked only at the Dock Board's 20-foot profile survey in approving the berth application for the Turchia. Thus, even if one were to assume that the statement was misleading, the Dock Board has failed to adduce "[e]vidence of reliance [that] is necessary to establish that governmental negligence was a cause of injury." *Sheridan Transp.*, 834 F.2d at 474.

**IV. CONCLUSION**

Based on the above findings of fact and conclusions of law, the Court concludes that with respect to the Dock Board's failure-to-warn claim against the Government, judgment must be entered in favor of the Government. The Dock Board's claim against the Government is hereby DISMISSED with prejudice and costs.

New Orleans, Louisiana, this 29th day of September, 2010.

UNITED STATES DISTRICT JUDGE